AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

2013 FEB 22 P 2: 42

| | |
|---|---|
| United States of America<br>v.<br><br>QUIN NGOC RUDIN,<br>a/k/a DAVID RUBIN and DEAN RUBIN<br><br>*Defendant(s)* | )<br>)<br>)   Case No. 3 13 70192 MEJ<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  11/21/2012 and 1/9/2013  in the county of  Contra Costa  in the  Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code,<br>Section 1343; | Wire Fraud |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

✓ Continued on the attached sheet.

*Complainant's signature*

Christopher M. Donahue  /  Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  2-22-13

*Judge's signature*

City and state:  San Francisco, California     United States Magistrate Judge Maria-Elena James
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT, ARREST WARRANT, AND SEIZURE WARRANT

I, Christopher M. Donohue, being first duly sworn, hereby depose and state as follows:

### A. Introduction and Agent Background

1. I make this affidavit in support of the following:(a) a Criminal Complaint against QUIN NGOC RUDIN, also known as DAVID RUBIN and DEAN RUBIN;(b) an Arrest Warrant for QUIN NGOC RUDIN, also known as DAVID RUBIN and DEAN RUBIN; and (c) an application for a seizure warrant for a Wells Fargo Bank account controlled by RUDIN (the "Subject Bank Account"). As set forth below, there is probable cause to believe RUDIN has committed wire fraud, in violation of Title 18, United States Code, Section 1343.

2. I am a Special Agent of the Federal Bureau of Investigation (FBI), and I have been so employed for more than twelve years. I am currently assigned to the San Francisco Field Office of the FBI. As part of my assigned duties, I investigate possible violations of federal criminal law. I am currently assigned to a squad that focuses on the investigation of complex financial crimes. During my career as an FBI agent, I have participated in more than 100 such white collar investigations, and I have been the lead or co-lead agent in more than 35 of those investigations.

3. This affidavit is based on my personal knowledge and information obtained from documents, witnesses, and other law enforcement officials. The information contained in this affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint against RUDIN and in support of the applications for a seizure warrant. As such, this affidavit does not include all of the information that I have acquired while participating in this investigation.

### B. Probable Cause to Believe Crimes Have Been Committed

4. Background on "CSI" and the Purchase of its equipment

1

a. CSI (these are the initials of the company, not its full name) is a multinational corporation headquartered in San Jose, California, that designs, manufactures and sells technology equipment to end users. End users may be corporate entities or individuals. Because CSI's equipment is expensive, CSI has a financing arm that allows end users to finance purchases. In order to have the purchase of equipment financed, the end user must prove that it is creditworthy by providing CSI with current, audited financial statements and other information.

b. End users frequently purchase CSI's equipment through a CSI authorized partner (hereinafter "partner"). These partners are knowledgeable about CSI's equipment and the end users' needs.

c. When CSI finances an end user's purchase or lease of equipment, there will be up to four parties in the transaction: (i) the end user purchasing or leasing the equipment, (ii) CSI providing the equipment and financing for the purchase or lease of the equipment, (iii) the partner providing assistance to the end user with installation and use of the equipment and/or (iv) an authorized distributor shipping the equipment to the authorized partner or end user.

d. Two documents are typically signed for such a transaction. One is a Lease Agreement between CSI and the end user in which CSI agrees to sell or lease the equipment to the end user in exchange for monthly payments. The second is a Progress Payment Agreement (PPA) between CSI and the end user that sets forth the conditions of the Lease Agreement, including payment terms. Generally in a PPA, CSI offers to purchase equipment for the end user by paying the partner so the partner can in turn buy the equipment from the distributor and install the equipment for the end user. In return, CSI receives monthly payments from the end user.

5. CGC, AP, and CSI Agreements

a. On or about June 19, 2011, a company called CGC DIGITAL LLC (CGC) became a partner of CSI. On or about September 19, 2012, "DEAN RUBIN" renewed the partnership on behalf of CGC. RUBIN provided CSI with the email address dean@cgcdigital.com and the telephone number 1-909-203-9340.

2

b. In or around early October 2012, CGC contacted CSI about the purchase of equipment to be sold to AP (an end user). On October 8, 2012, an individual identified as Ron Peoples emailed CSI from the email ronp@cgcdigital.com. The email included a bill of materials setting forth the equipment that AP wanted to purchase, which totaled $5,857,999.60. The email also included two audited financial statements showing AP's financial health and ability to make monthly lease payments for the equipment. CSI reviewed the financial documents and approved the financing of the AP transaction.

c. As a result, CSI entered into several agreements involving the transaction with the company that purported to be AP:

    i. CSI signed a Lease Agreement with who they believed to be AP on or about October 26, 2012. An email with the lease agreement attached was sent from ronp@cgcdigital.com to a CSI employee, copying "Dean Rubin" and edward@cgcdigital.com. According to the lease agreement, AP would receive approximately $5,857,999.60 of CSI equipment, financed by CSI, in exchange for making monthly payments to CSI. The payments were to start six months after the commencement of the Lease Agreement. A person with the initials CR signed the lease agreement on behalf of AP, as AP's Chief Financial Officer. AP directed that invoices from CSI be sent to 515 South Flower Street, Suite 3600, Los Angeles, California 90071, to the attention of CR, and listed an email address for AP ending in ".net."

    ii. CSI signed a PPA with who they believed to be AP on or about October 26, 2012. An email with the PPA attached was sent from ronp@cgcdigital.com to a CSI employee. The PPA provided that the financing would be paid in three separate payments, called progress payments. The PPA authorized CSI to pay the partner, CGC, the progress payments. A person with the initials CR signed the PPA on behalf of AP, as AP's Chief Financial Officer.

3

        iii. CSI entered into an assignment of proceeds agreement with CGC and a distributor "V" (this is the initial of the distributor, not its full name), whereby CGC assigned V its right to collect 46.34 percent of the progress payments from CSI. This is because V was providing the CSI equipment to CGC for CGC to install for AP.

    d. In sum, the CSI deal with AP was as follows: CSI would pay a partner (CGC) to purchase and install the CSI equipment for AP. CGC obtained the CSI equipment from a distributor (V). Pursuant to the agreements, CSI would make upfront payments to both CGC and V for the purchase and installation of the CSI equipment at AP, and AP would then make monthly repayments to CSI for the equipment.

    6. AP Email Addresses

    a. On or about October 8, 2012, prior to the agreements being entered into, CSI had attempted to send an email to AP. However, CSI had used an email address with a domain name ending ".com." The email concerned the the first progress payment. CSI did not receive a response.

    b. On November 16, 2012, CSI forwarded that email to ronp@cgcdigital.com and "DEAN RUBIN" at dean@cgcdigital.com, since CGC was the partner providing the installation of CSI's equipment to AP. RUBIN then forwarded CSI's email to CR at AP, using an email address for CR that was the same domain name as used in the preceding paragraph, except ending in ".net" instead of ".com." On November 20, 2012, CSI received an email response from CR, as CFO of AP, using a ".net" email address, which authorized CSI to make the first progress payment to CGC. The forwarded email from RUBIN to CR at the ".net" email address was attached to the email CR sent to CSI.

    c. A search of the website betterwhois.com showed the AP domain ending in ".net" was registered at the website GoDaddy.com on or about October 23, 2012, by CGC Digital, 25 Grassy Knoll, Rancho Santa Margarita, California 92688, United States, and the administrative contact was Ngo, Tony, dean@cgcdigital.com, with the same address. Hence, it appears that CGC purchased the very same domain name as the true AP,

4

except for the suffix of the email address: the true AP email addresses ended in ".com" whereas the apparent CGC imposter AP email addresses ended in ".net."

    d. Moreover, around the same time, AP's contact information on the California Secretary of State website was changed without AP's knowledge or approval. AP's contact information was changed to list the address at South Flower Street in Los Angeles, California. AP's true address was and remains 12540 Mcann Drive in Santa Fe Springs, California.

    7.    Payments

    a. CGC provided CSI with wiring instructions for the AP transaction. The instructions were for CSI to wire money to CGC Digital LLC, 28562 Oso Parkway, Suite D306, Rancho Santa Margarita, California 92688, accounts receivable contact DEAN RUBIN, telephone 909-203-9340, email address dean@cgcdigital.com. The wire instructions provided CGC's bank as Wells Fargo Bank in Oakland, California, and an account number ending in 1653.

    b. On or about November 21, 2012, CSI wired $1,464,499.90 into CGC's Wells Fargo bank account ending in -1653 (WFB 1653). That same day, CSI wired $1,464,499.90 into V's Bank of America account ending in -0212 (BOA 0212).

    c. On January 2, 2013, CSI emailed CR, at the email address ending in ".net," asking for authorization to make the second progress payment per the terms of the PPA. The following day, an email sent from that same email address authorized that second progress payment.

    d. On or about January 9, 2013, CSI wired $507,169.83 into CGC's Wells Fargo bank account (WFB 1653). That same day, CSI wired $1,250,230.05 into V's BOA 0212 account.

    e. In early February 2013, CGC contacted CSI to inform it that the all the equipment was installed for AP, that everything was working properly, and that CGC was requesting a release of the third and final financing payment. CSI contacted the email address for AP ending in ".net" to confirm CGC's statements and obtain AP's authorization to issue the final payment. Final Payment has not been made (see below).

5

   f. In total, CSI wired $1,971,669.73 to CGC and $2,714,729.95 to V in connection with this transaction.

   8.   Discovery of Fraud and RUBIN's Identity

   a. On February 3, 2013, the true CR who works at the true AP contacted CSI to inquire why CSI filed a UCC-1 Financing Statement on company AP related to the purchase of CSI's equipment when, in fact, AP had never purchased this equipment. CSI provided CR with copies of signed contracts which purportedly had her signature. CR told CSI: (1) the signatures were not hers; (2) she was not nor ever had been CFO of AP; (3) AP had never purchased or received the CSI equipment[1]; and (4) her email address ends in ".com" and not ".net."

   b.   An employee of CSI ("Employee") told me that he dealt in person with "RUBIN" regarding the AP transaction, as well as other transactions.[2] Employee has flown on a private aircraft arranged by RUBIN for business development. Employee and RUBIN have had lunch together in the San Diego area to discuss business opportunities. Employee told me of a meeting where RUBIN's associate called RUBIN "Quin." RUBIN explained to Employee that "Quin" was RUBIN's Hawaiian name. When shown a California Driver's License photograph of QUIN NGOC RUDIN, Employee stated that the person in the photograph was the person he knew as "DEAN RUBIN." Emails provided by CSI also show RUBIN addressed as "Quin."

   c. CSI provided an email chain between CSI employees and "DEAN RUBIN" regarding a lunch appointment scheduled for November 15, 2012, from 12:15 p.m. to 1:30 p.m. After some discussion over email, dean@cgcdigital.com said he would meet the CSI employees at CSI's "irvine (sic) office." CSI provided me with a guest log of its Irvine, California, office. That log reflects that "DEAN RUBIN" physically entered CSI's Irvine office on November 15, 2012.

---

[1] The equipment was purported to be delivered to AP, but to an address unknown to the company. The location of the CSI equipment itself is still under investigation.

[2] These prior transactions are currently under investigation for similar fraudulent activity.

   d. In addition to the guest log, CSI provided me with a video still photo taken by their security system on November 15, 2012, with a time stamp of 12:01:13. Employee identified the person as the man he knows as "DEAN RUBIN." In my opinion, the man in the video still photo appears to be the same person identified in the California Driver's License bearing the name of QUIN NGOC RUDIN.

   e. On December 21, 2012, "RUBIN" provided Employee with his address: 2218 Mission Avenue, San Diego, CA 92166.

   9. Bank Records

   a. I have reviewed bank records for CGC's Wells Fargo account ending in 1653 (WFB 1653) from September 1, 2012, through approximately January 31, 2013. This account is a business checking account for CGC Digital LLC, 28562 Oso Parkway, Suite D306, Rancho Santa Margarita, California 92688-5595. According to Wells Fargo Bank, WFB 1653 has two authorized signatories: QUIN RUDIN and a person with initials CK.

   b. The November 2012 statement for WFB 1653 shows that CSI's wire transfer of $1,464,499.90 was credited to WFB 1653 account on November 29, 2012.

   c. The January 2013 statement for WFB 1653 shows that CSI's wire transfer of $507,169.83 was credited to WFB 1653 account on January 11, 2013.

   10. Prior Fraudulent Activity

   a. CSI has become aware that RUDIN and others have been sued by a company, hereinafter called OC, for creating fraudulent partners and end users of OC in an attempt to receive money extended by OC's finance arm.

   b. I reviewed a civil complaint against RUDIN and others filed in California Superior Court by OC on December 3, 2010. The complaint alleged that the defendants established a group of fraudulent entities, posing as legitimate partners and end users of OC, to obtain over $1 million in financing from OC. OC extended credit to the false entities. Based on my review of documents related to the case, it appears that RUDIN did not

appear in court: the Court entered a default judgment against him.

11. Suspected Ongoing Fraud

a. I have reviewed emails reflecting that CGC representatives recently have been in contact with CSI employees.

      i. On February 5, 2013, ronp@cgcdigital.com sent an email to a CSI employee based in Colorado, copying dean@cgcdigital.com. The email stated the following in part: "I sent you invoices for [AP]… Can you please confirm that you have received them and let me know when we may receive payment on said invoices?"

      ii. On February 12, 2013, ronp@cgcdigital.com again emailed the CSI employee based in Colorado and copied dean@cgcdigital.com. The email said in part: "Any word on when the funds will be released?"

      iii. On February 20, 2013, ronp@cgcdigital.com again emailed the CSI employee based in Colorado and copied dean@cgcdigital.com. The email said in part: "It has been over a week since I sent you this follow up email and we still have not received payment for AP… Can you please track it down so we can make sure that we will be receiving payment?"

      iv. On February 20, 2013, ronp@cgcdigital.com once again emailed the CSI employee based in Colorado about new deals involving the purchase of $9 million of CSI's equipment.

b. On February 15, 2013, Employee had a lunch meeting with "RUBIN" that was observed by FBI Agents. Employee had previously identified "RUBIN" as the same person in the driver's license photograph of "QUIN NGOC RUDIN" (see paragraph 8, subparagraph b above). At that meeting, Employee and "RUBIN" discussed the deal with AP including the terms of the agreements and the supposed parties to the agreements. After the meeting,

FBI Agents conducted a physical surveillance of "RUBIN," following him to a San Diego residence. The address of this residence is one "RUBIN" had previously provided to the Employee of 2218 Mission Avenue, San Diego, CA 92166.

### C. Evidence of Wire Transactions

12. As previously mentioned, CSI sent two wires to V's BOA 0212 account on November 21, 2012 and January 9, 2013 for a total of $2,714,729.95.

13. These wirings were an essential part of the scheme to defraud because the wired money went to V (the distributor) so that V would deliver the equipment for CGC to then install for AP (the end user). It is only in conjunction with V's providing the equipment that CGC can then install and provide service for the equipment to AP. CSI only wires money to CGC because of their purported performance of these services (installation and service of CSI's equipment to AP).

14. A Bank of America investigator informed me that the address on BOA 0212 is in Saint Charles, Illinois.

15. CSI informed me that CSI used their bank in Concord, California to make these two wire transfers.

### D. Seizure Warrant

16. Applicable Statutes

a. Title 18, United States Code, Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds" traceable to . . . any offense constituting a "specified unlawful activity" ("SUA"). Title 18, United States Code, Section 1956(c)(7) defines SUAs to include wire fraud, in violation of Title 18, United States Code, Section 1343. Title 28, United States Code, Section 2461, provides for criminal forfeiture where the civil forfeiture of property is authorized. Title 18, United States Code, Section 981(b) and Title 21, United States Code, Section 853(f) provide for the seizure of

9

property subject to civil and criminal forfeiture.

 b. Title 18, United States Code, Section 984 provides that, in any forfeiture action in which the subject property is funds deposited into an account in a financial institution, the government is not required to identify the exact funds involved in the offense that is the basis for the forfeiture; it is no defense that those funds have been removed and replaced by other funds; and identical funds found in the same account as the funds involved in the forfeiture offense are subject to forfeiture. Title 18, United States Code, Section 984 allows the government to seize for forfeiture identical property found in the same place where the "guilty" property had been kept. However, Title 18, United States Code, Section 984 does not allow the government to reach back in time for an unlimited period – a forfeiture action (including a seizure) against property not directly traceable to the offense that is the basis for forfeiture cannot be commenced more than one (1) year from the date of the offense.

 17. Based on my training, experience, and the information contained in this affidavit, there is probable cause to believe that funds up to $1,971,669.73 (the $1,464,499.90 CSI wired into WFB 1653 on or about November 21, 2012 and the $507,169.83 CSI wired into WFB 1653 on or about January 9, 2013) are forfeitable to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461, because they constitute proceeds of wire fraud scheme in violation of Title 18, United States Code, Section 1343. As such, I respectfully request the authority to seize funds up to $1,971,669.73 from WFB 1653.

 18. I learned that RUDIN is a signatory to a Wells Fargo Bank account ending in 1653 (WFB 1653) along with an individual with the initials CK. This account is a business checking account in the name of CGC Digital LLC, 28562 Oso Parkway, St D306, Rancho Santa Margarita, California 92688.

### E. Conclusion

 19. Based upon the foregoing, there is probable cause to believe that RUDIN has conducted and continues to conduct a scheme to defraud, in violation of Title 18, United States Code, Section 1343. There is also probable cause to believe that

$1,971,669.73 in funds deposited into WFB 1653 was obtained by RUDIN as a result of his fraudulent scheme. Accordingly, I respectfully request that an arrest warrant be issued for RUDIN and that a seizure warrant be issued for all funds up to $1,971,669.73 in WFB 1653.

### F. Request for Sealing

19. Because this investigation is continuing, and because the arrest and seizure will take place after this Affidavit is executed, I believe that disclosure of this Application, Affidavit, Arrest Warrant and Seizure Warrant likely would jeopardize the progress of the investigation. Accordingly, I request that the Court issue an order that the entire file in this matter be sealed until further order of the Court.

Christopher M. Donohue
Special Agent,
Federal Bureau of Investigation

Sworn to and subscribed before me this 22 day of February, 2013

Maria-Elena James
United States Magistrate Judge

11